BOWMAN, Circuit Judge.
This action arises out of the default and bankruptcy of a grain farming partnership conducted by plaintiff brothers Kal and Robert Knickerbocker. They filed this action against defendant First National Bank of Oelwein (FNBO) in state court alleging breach of contract and intentional interference with contractual relationships. The action was removed to federal district court pursuant to 28 U.S.C. § 1334(b) as a matter “related to” Kal Knickerbocker’s bankrupt *284 cy proceeding, and was tried before a jury.[1] The jury returned a verdict for the Knickerbockers on both of their claims, and awarded damages in excess of $3 million. Upon FNBO’s motion, the trial court granted judgment notwithstanding the verdict. The court held that the Knickerbockers’ evidence demonstrated only a simple breach of contract by FNBO, but did not support the Knickerbockers’ intentional interference claim. Order at 6-7. The court held that even if the evidence were sufficient to support a finding of liability on the latter claim, the evidence adduced concerning the Knickerbockers’ alleged damages was insufficient to support the jury verdict. Finally, the court found the evidence insufficient to support any of the damages awards on the contract claim. Order at 7-13. The Knickerbockers appeal.
I.
In reviewing the trial court’s ruling on FNBO’s motion for judgment notwithstanding the verdict, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the Knickerbockers. Williams v. Ryder/P.I.E. Nationwide, Inc., 786 F.2d 854, 857 (8th Cir.1986). In the present case, this requires us to resolve any factual conflict in the testimony in favor of the Knickerbockers, to assume as true all facts which the Knickerbockers’ evidence tends to prove, to give the Knickerbockers the benefit of all reasonable inferences derived from the evidence, and to reverse the trial court’s order granting the motion if the evidence so viewed would allow reasonable jurors to accept the Knickerbockers’ version of the facts. See Ryko Manufacturing Co. v. Eden Services, 823 F.2d 1215, 1221 (8th Cir.1987). Based on our review of the evidence under the foregoing stan dard, we conclude that the jury reasonably could have found the pertinent facts to be as follows.
Kal and Robert Knickerbocker had been farming in northeastern Iowa for several years. They conducted separate hog farming operations, but in 1978 they formed a grain farming partnership that was designed initially to provide feed for their hogs. Trial Transcript (Tr.) at 5,175. The grain operation quickly expanded beyond the immediate needs of the hog operations, and by 1983 the partnership was producing grain on approximately 4,000 acres of crop land in Iowa, Minnesota, and Wisconsin. Tr. at 175-81. Nearly all of the land and the equipment used in the grain operation was leased. Tr. at 174, 183. The grain operation was successful, and the Knickerbockers enjoyed a good reputation as farmers. Although the grain operation was profitable, both of the Knickerbockers suffered significant losses in their individual hog farming operations. Tr. at 16-18, 22-23, 175-77, 191-92. As a result, in 1983, the Knickerbockers decided to quit raising hogs and to focus their efforts exclusively on grain farming. Tr. at 23, 188.
FNBO had loaned money to both of the Knickerbockers to finance their hog operations, and the Knickerbockers were still in debt to FNBO when they decided to get out of the hog business. In 1983, Kal Knickerbocker’s outstanding debt to FNBO was approximately $580,000 and Robert Knickerbocker’s debt was approximately $35,000. Tr. at 50, 537. This debt made it difficult in 1983 for the Knickerbockers to secure financing to plant their crops; apparently because of the size of Kal Knickerbocker’s outstanding debt, FNBO was unwilling to provide additional financing to the grain farming partnership. Tr. at 75-76. The Knickerbockers eventually borrowed $400,-000 for their 1983 planting from First Bank Systems Agricultural Credit Corporation (FBS). Tr. at 591.
FBS made it clear that its loan was solely for the 1983 season, and that its willingness to provide credit to the Knickerbockers was based on their participation in the 1983 government price support program, which FNBO believed provided adequate collateral for the loan. Tr. at 589-91. To *285 administer the loan, FBS entered into an agreement with FNBO under which FNBO undertook collection and accounting responsibility for the FBS loan. As part of that agreement, FNBO subordinated itself to FBS with respect to the satisfaction of any of the Knickerbockers’ old debts with FNBO. Tr. at 590.
In late summer of 1983, the Knickerbockers began selling corn harvested in 1982 and “sealed” as collateral under a prior financing arrangement with the Commodity Credit Corporation (CCC).[2] When the Knickerbockers began selling the 1982 sealed com, they discovered that the corn was spoiling, and already had been severely damaged. Tr. at 29-31. To maintain the market price of the 1982 sealed com, the Knickerbockers began blending damaged com with better quality com. Tr. at 31. This process eventually depleted the supply of better quality corn, and the Knickerbockers began blending some of their 1983 com crop with the sealed 1982 com. Tr. at 86. At about the same time, CCC made spot inspections of the Knickerbockers’ sealed com and discovered both the deteriorating quality of the grain and a substantial shortage in the number of bushels in storage.[3] Tr. at 658-61.
As a result of these discoveries, CCC “called” the 1982 loan, and contacted Aurora Supply, the grain elevator at which the Knickerbockers marketed their com. Tr. at 659-62. Aurora thus was alerted to its potential liability to CCC for any proceeds from the sale of the Knickerbockers’ 1982 grain, and, as the trial court observed, this effectively cut off the Knickerbockers’ cash flow. Order at 4-6.
The impact of this cash flow interruption was substantial, primarily because the Knickerbockers were facing deadlines both on farmland and equipment lease payments and on payments on the FBS loan. The problem led to several meetings between the Knickerbockers and representatives of FNBO, FBS, and Aurora Supply in November 1983. At each of these meetings, the Knickerbockers expressed concern about payments to their landlords. Tr. at 26, 39. On November 29, 1983, an agreement was reached whereby Aurora Supply would remit to FNBO monies derived from the sale of the Knickerbockers’ com.
The Knickerbockers and a representative from Aurora Supply testified that Aurora demanded, in return for its agreement to remit the proceeds to FNBO, a hold-harmless agreement from FNBO protecting Aurora from all claims of the landlords, FBS, and CCC against proceeds from the sale of the Knickerbockers’ grain. Tr. at 161; Transcript of Testimony of Stephen Paris (Paris Tr.) at 12-13, 15. FNBO disputes this, claiming that Aurora sought protection only from the landlords. Tr. at 715, 836. The Knickerbockers further testified that both FNBO and FBS agreed that FNBO would first apply the proceeds received from Aurora to satisfy the Knickerbockers’ lease obligations to their landlords, and then apply the remaining funds to the FBS and CCC debts. Tr. at 39, 124, 208-10. FNBO also disputes this testimony, arguing that the agreement provided that the landlords and FBS would receive equal priority, and that the landlords would be paid only when sufficient funds were deposited with FNBO to pay both them and FBS. Tr. at 746-49. Finally, Robert Knickerbocker testified, and the jury could have viewed FNBO’s attorney’s testimony *286 on cross-examination as an admission, that the attorney informed CCC’s representative at the meeting that CCC had not perfected its Iowa lien on the 1982 crop, and therefore was not entitled to a priority claim against the Knickerbockers’ grain proceeds. Tr. at 55, 924-25.
Following the November meeting, Aurora Supply delivered proceeds to FNBO sufficient to cover the lease payments to the landlords, but insufficient to cover payments to both the landlords and FBS. Tr. at 560. When it subsequently received the hold-harmless letter prepared by FNBO, Aurora Supply concluded that the letter was not in accord with the agreement reached at the November meeting. Paris Tr. at 16. Fearing liability to CCC for proceeds from the Knickerbockers' grain, Aurora Supply refused to release any further proceeds without naming ASCS (the administrator of CCC programs) as a payee. Paris Tr. at 16. Because ASCS was unwilling to endorse and release checks for the proceeds, FNBO was unable to negotiate them. Tr. at 750-51, 842. Therefore, despite the agreement reached at the November meeting, Aurora Supply failed to release all the available proceeds to FNBO’s sole custody, and FNBO refused to pay anyone with the portion of the proceeds that it received.
FNBO knew that failure to pay the landlords would result in the termination of the Knickerbockers’ farmland leases. Tr. at 559-60. Nevertheless, in late December, despite repeated requests by the Knickerbockers, FNBO still was refusing to pay the landlords. Tr. at 46, 48-49. According to Robert Knickerbocker’s testimony, a representative of FNBO observed in late December that “you guys are in such financial trouble, you’re going down the tubes.” Tr. at 49.
This prediction proved to be correct. The failure to pay the landlords resulted in cancellation of the farmland leases, Tr. at 10, 57, and, subsequently, acceleration of the equipment leases. In early January, following another unsuccessful meeting in the attempt to resolve the impasse, Kal Knickerbocker declared bankruptcy. Tr. at 617-19, 665-69. Shortly thereafter, the Knickerbockers filed this action charging FNBO with intentional interference with the farmland lease contracts, and with breach of contract.
FNBO maintains that its agreement with the Knickerbockers was not to pay the landlords first, but to pay both the landlords and FBS when sufficient funds were received to do so. It argues that it did not fail to pay the landlords because it intended to force the cancellation of the leases, but because without sufficient funds to pay both sets of claims, it feared liability to FBS if it paid the landlords first. The Knickerbockers dispute this asserted justification. Rather, according to the Knickerbockers, FNBO’s failure to honor its November 29 agreement to pay the landlords was a calculated step designed to force the Knickerbockers into liquidation.
In support of their argument, the Knickerbockers point to FNBO’s preparation of an internal analysis of Kal Knickerbocker’s outstanding debt in the early fall of 1983, before the problem arose with the 1982 grain proceeds from Aurora Supply. Tr. at 997. That analysis showed that if FNBO foreclosed on Kal’s outstanding debt immediately, it would realize a $217,308 loss on its loan. Tr. at 999. However, the same analysis showed that if FNBO continued to finance the Knickerbockers, it would lose $288,731 on the loan. Tr. at 1000. On October 1,1983, FNBO’s board of directors charged off the $217,000 loss on Kal Knickerbocker’s debt in accordance with the analysis. Tr. at 997. According to the Knickerbockers, this demonstrates that FNBO had the incentive, and had made the decision, to force their farming partnership into liquidation even before the November 29 meeting. FNBO disputes this characterization of the charge-off, arguing that both sound banking management and federal banking regulations require that poorly performing loans be analyzed and that they be charged off as losses when it is prudent to do so. Tr. at 995-96.
As noted above, the jury returned a verdict for the Knickerbockers on both the contract and interference with contractual *287 relations claims. Based on our review of the testimony, we cannot say that the jury’s conclusions were lacking in substantial evidentiary support. The evidence was conflicting, and were we the fact-finder, which we are not, we might have decided the issues differently. However, the jury obviously credited the Knickerbockers’ testimony (and discounted the testimony of FNBO) regarding the terms of the agreement reached at the November meeting, and regarding FNBO’s reasons for not performing the agreement. The jury reasonably could have found that FNBO had contracted with the Knickerbockers to pay their landlords ahead of other creditors out of the proceeds received from Aurora Supply, and that FNBO’s subsequent refusal to apply the proceeds in that manner was a breach of contract.
We reach a similar conclusion with respect to the Knickerbockers’ intentional interference claim. Under Iowa law, the elements of a claim for intentional interference with contractual relations are: “an existing valid contractual relationship ..., knowledge of [the relationship] by the interferer, intentional interference inducing or causing a breach or termination of the relationship ..., and resulting damage.” Westway Trading Corp. v. River Terminal Corp., 314 N.W.2d 398, 402-03 (Iowa 1982) . In a case involving an existing contract, the plaintiff need not show that the interferer had a specific purpose to injure or destroy the plaintiff. Rather, it is sufficient for the plaintiff to show that the defendant knew that interference with the plaintiff’s contractual relationships was substantially certain to result from an act committed by the defendant with some other purpose. Restatement (Second) Torts § 766, comment j (1977). Although Iowa courts recognize that justification is a defense, Locksley v. Anesthesiologists of Cedar Rapids P.C., 333 N.W.2d 451, 455 (Iowa 1983), and therefore that the bona fide assertion of a legally protected interest is not tortious, see C.F. Sales, Inc. v. Amfert, Inc., 344 N.W.2d 543, 555 (Iowa 1983) , the defense turns upon a determination of the defendant’s primary intent, purpose, or motive in engaging in the interfering conduct. Such a determination clearly is an issue of fact for the jury, and FNBO does not argue that there was any error in the instructions on which this issue was submitted to the jury.
In granting FNBO’s motion for judgment notwithstanding the verdict, the trial court concluded that there was “simply no evidence that defendant intended to interfere with plaintiffs’ contracts] with their landlords when [defendant] refused to pay out the money. Rather, defendant’s reason in not paying the landlords was [that it was] uncertain as to who had priority and [was afraid] of having to pay twice.” Order at 7. We believe that the trial court erred in setting aside the jury’s determination with respect to the intentional interference claim.
Based on the evidence, the jury could have concluded not only that FBS had agreed to allow the landlords to be paid first, but also that FNBO knew that the CCC claim was unperfected, and thus that FNBO knew it faced no real threat of double liability. Similarly, although the jury could have accepted FNBO’s explanation that the analysis and charge-off of Kal Knickerbocker’s loan was a routine matter, it could also have concluded that this otherwise routine analysis of Kal Knickerbocker’s loan put FNBO on notice that it would lose less money on its outstanding loans if the Knickerbockers’ grain operation was liquidated. The jury could have interpreted the subsequent charge-off of the lesser amount and the comment of the FNBO officer that the Knickerbockers were, in any case, “going down the tubes,” as indications that FNBO had decided to liquidate the Knickerbockers’ fanning operations regardless of their ability to survive if the farmland lease payments were made. Accordingly, the jury could have viewed FNBO’s failure to provide the hold harmless letter to Aurora Supply, and its failure to pay the landlords as agreed, as calculated steps designed to put the Knickerbockers out of business.
We therefore cannot agree with the court below that the jury was presented *288 with insufficient evidence from which it reasonably could conclude that FNBO possessed the requisite intent to interfere with the Knickerbockers’ contracts with their landlords when FNBO refused to pay the landlords as agreed. We reverse the trial court’s order granting FNBO’s motion for j.n.o.v. on the tortious interference claim.
II.
The jury awarded damages in the following amounts:
Kal Knickerbocker Robert Knickerbocker
Lost Profits $375,000 $400,000
Equipment Lease Acceleration [4] 620,000 620,000
Punitive Damages 50.000 50.000
Credit Reputation 400,000 400,000
Emotional Distress 50.000 52.000
In addition to finding that the Knickerbockers had not produced sufficient evidence to support their claim for intentional interference, the trial court found that each of the jury’s damage awards suffered from a similar defect.[5] Iowa courts “take a broad view in determining the sufficiency of evidence of damages,” and damages awards are to be upheld “so long as the record discloses a reasonable basis from which the amount[s] can be inferred or approximated.” Westway Trading Corp., 314 N.W.2d at 403; Page County Appliance Center, Inc. v. Honeywell, Inc., 347 N.W.2d 171, 178 (Iowa 1984). We examine each of the jury’s damages awards under this substantive standard of Iowa law.
A.
The trial court found that the jury’s award of damages for lost profits was based on speculation and conjecture, and that the testimony of the Knickerbockers’ expert witness regarding damages was not a sufficient predicate because it was “based on historical data obtained from Iowa State University and the expansion of those figures, rather than the actual performance of the Knickerbockers’ operation.” Order at 11. In Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Management, Inc., 519 F.2d 634, 640 (8th Cir.1975), we observed that an award for lost profits under Iowa law must be supported, inter alia, by “proof of a rational basis from which the amount can be inferred or approximated.” An award for lost profits may not be based on pure conjecture or speculation. See Harsha v. State Savings Bank, 346 N.W.2d 791, 797 (Iowa 1984); Shinrone, Inc. v. Tasco, Inc., 283 N.W.2d 280, 286 (Iowa 1979). However, this rule does not require that data regarding a plaintiff’s actual performance be employed in every case. In Lakota, we upheld the jury's award of lost profits for breach of a fund-raising contract based on expert testimony regarding similar fund-raising in other areas. Id. at 641-43. More significantly, while we observed that the decision to submit expert testimony of this nature to the jury to assist in the calculation of damages is a matter resting within “the sound discretion of the trial court,” id. at 642, we also observed that *289 once such testimony “is so submitted, the jury will ... have a large amount of discretion in determining the amount of its verdict,” id. at 643 (quoting 5 Corbin on Contracts § 1022 (1964)).
Here, the Knickerbockers’ expert based his projections of their lost profits on average and historical data regarding crop yields, production costs, and sale prices in the geographic region where the Knickerbockers farmed. Tr. at 281-82, 286-90. Although the expert compared the average data with data regarding the actual expenses incurred in the Knickerbockers’ grain operation, he relied on the averages in making his calculations of the Knickerbockers’ farming expenses. Tr. at 234-35. Moreover, in making his cost projections, the expert apparently relied on data derived from production costs for crop yields of 90 bushels per acre, while the data employed in making the income projections was derived from revenues associated with yields of 115 bushels per acre. Tr. at 308-14. Finally, the expert’s testimony regarding the Knickerbockers’ production costs flatly contradicts Robert Knickerbocker’s own testimony regarding those costs. Tr. at 66. We agree with the trial court that the expert’s testimony regarding the Knickerbockers’ production costs was not sufficiently tied to the Knickerbockers’ actual farming operation and was seriously flawed in other respects, and therefore did not give the jury a reasonable basis for inferring or approximating production costs.
We do not agree, however, that the expert’s testimony regarding future revenues was so speculative and conjectural as to render it insufficient to support an award for damages. The expert based his revenue projections on historical information that was consistent with the Knickerbockers’ actual crop yields, Tr. at 236, and on price projections based on both market conditions and government price support programs. Tr. at 238-44. To project future crop yields, commodity prices, and the impact of government price supports is an imprecise business in the best of circumstances. Here, we believe the expert did provide a reasonable, albeit tenuous, connection between his extrapolations and the Knickerbockers’ grain operation.
In these circumstances, we believe the trial court erred in granting FNBO’s motion for j.n.o.v. There was evidence from which the jury could have derived an award for lost profits, by comparing the Knickerbockers’ own testimony regarding production costs and land set asides (a requirement for participating in government price support programs) with the expert’s testimony regarding projected revenues. Accordingly, we vacate the order of the trial court granting FNBO's motion for j.n.o.v. on the jury’s award of lost profits. However, we believe that as a matter of law the evidence does not support the large amounts of lost-profits damages that the jury has awarded. We therefore remand the case for a new trial on the issue of damages for lost profits unless plaintiffs consent to a remittitur of lost profits to $155,000 for Robert Knickerbocker and $145,000 for Kal Knickerbocker.[6] If within twenty days after the issuance of our mandate both appellants have not consented to the remittitur, the trial court is directed to order a new trial limited solely to the issue of damages for lost profits.
B.
The trial court found that the evidence supporting the jury’s awards for damages resulting from the acceleration of the equipment leases was insufficient. Order at 9. As the trial court observed, “the jury was instructed that the measure of damages was the difference between what was paid and what would have been paid, but the record contained no evidence as to *290 what would have been paid.” Order at 9. Kal Knickerbocker testified that the acceleration of the equipment leases resulted in a $624,074.03 debt, after an offset for the salvage value of the equipment. Tr. at 626. However, he was unable to give any indication of the amount that would have been owed on the leases had the partnership continued in operation. Tr. at 626. Similarly, although the payment schedules for the equipment leases were among the exhibits presented to the jury, the schedules did not indicate which payments already had been made, and there was no computation of the present value of the obligation to make the lease payments in future years. Without this information, the jury had no basis from which to calculate the award. Accordingly, the trial court was correct in concluding that this damages award could not stand, and we affirm its order granting FNBO’s motion for j.n.o.v. with respect to the damage awards for equipment lease acceleration.
C.
The trial court set aside the jury’s award of punitive damages, finding that the award was not supported by evidence that FNBO’s conduct “was wanton or reckless, exhibiting complete disregard for the plaintiff[s’] rights.” Order at 8. Iowa law permits the award of punitive damages for tortious interference with contract, Westway Trading Corp., 314 N.W.2d at 404, based on a showing that the defendant acted with actual or legal malice, Page County Appliance Center, Inc., 347 N.W.2d at 179. For this purpose legal malice is defined as “ ‘wrongful or illegal conduct committed or continued with a willful or reckless disregard of another’s rights.’ ” Id. (quoting McCarthy v. J.P. Cullen & Son Corp., 199 N.W.2d 362, 369 (Iowa 1972)). Punitive damages may be awarded even where no compensatory damages are awarded, as long as there is some injury upon which a compensatory claim may be based. Westway Trading Corp., 314 N.W.2d at 404.
The trial court accepted FNBO’s testimony regarding its motives in failing to make the lease payments, finding that “the evidence [did] not support the conclusion that [FNBO] intended to put [the Knickerbockers] out of business but rather acted out of a legitimate concern that [it] not be required to pay twice.” Order at 8-9. As we previously have observed, there was evidence from which the jury could have drawn a different conclusion regarding FNBO’s motives. While we need not agree with the conclusion, there was evidence from which the jury could have concluded that FNBO breached its agreement to pay the landlords with the express intent to cause the liquidation of the Knickerbockers’ farming operation. We believe that under the governing Iowa law plaintiffs presented a submissible case on their claim for punitive damages. Accordingly, we hold that the trial court erred when it granted FNBO’s motion for j.n.o.v. with respect to the award of punitive damages, and we reinstate the jury’s verdict.
D.
The trial court held that there was no evidence of malice to support the jury’s award for injury to the Knickerbockers’ credit reputation, and no evidence of tangible loss from which to calculate the specific amount of damages. Order at 7. As noted above in our discussion of punitive damages, there was evidence from which the jury could infer that FNBO acted with legal malice in failing to pay the Knickerbockers’ landlords as it had agreed to do. However, we agree with the trial court that the Knickerbockers submitted no evidence of actual injury on which to base a damages award for harm to credit reputation. Cf. Ellwood v. Mid States Commodities, Inc., 404 N.W.2d 174, 183 (Iowa 1987) (damages resulting from injury to credit reputation must be “proved with reasonable certainty”).
Although Robert Knickerbocker testified that plaintiffs were unable to obtain credit or farmland leases following FNBO’s failure to pay their landlords, Tr. at 57, there is nothing in the record even remotely suggesting an actual amount of loss resulting from this inability. As the trial court ob *291 served, the “evidence of [plaintiffs’] prior credit reputation was generally negative.” Order at 7-8. The Knickerbockers had encountered difficulty in obtaining credit for their 1983 planting, and nothing in the record suggests that similar, if not more substantial, difficulty would not have been encountered in 1984. Moreover, the Knickerbockers will be compensated for any loss resulting from injury to their credit reputation in the amounts awarded for lost profits, because they have made no showing that their credit reputation had any value other than in connection with the financing of their farming operations. Accordingly, we affirm the order of the trial court granting FNBO’s motion for j.n.o.v. with respect to the award of damages for injury to the Knickerbockers’ credit reputation.
E.
In setting aside the entire jury verdict, the trial court did not separately address the jury’s award of damages for the Knickerbockers’ emotional distress. Iowa law permits the award of damages for emotional distress in an action for intentional interference with contract. Peterson v. First National Bank of Iowa, 392 N.W.2d 158, 167 (Iowa Ct.App.1986). FNBO argues, however, that plaintiffs’ evidence was insufficient to support an award of damages for emotional distress. We agree.
The only testimony contained in the record regarding emotional distress is Kal Knickerbockers’ observation that the failure of the business “put very large strains on the entire family.” Tr. at 174. This testimony, standing alone, is inadequate to support the damages award. As observed by the Iowa Supreme Court, “[mjental anguish is suffered individually, not jointly, and differs greatly from person to person.” Wambsgans v. Price, 274 N.W.2d 362, 366 (Iowa 1979). It follows that such general testimony regarding strain on the entire family is, without more, insufficient to support an award of damages for emotional distress to Kal Knickerbocker and Robert Knickerbocker. Accordingly, the portion of the trial court’s order granting FNBO’s motion for j.n.o.v. with respect to the jury’s award of damages for emotional distress is affirmed.
III.
In summary, we reverse the order of the trial court granting FNBO’s motion for j.n. o.v. insofar as it applies to FNBO’s liability to the Knickerbockers for. breach of contract and for tortious interference with contract. With respect to the award of lost profits, we reverse the trial court’s order granting j.n.o.v., and order a new trial on the amount of lost profits unless the Knickerbockers agree to remittitur as specified at page 289, supra. We also reverse the trial court’s order insofar as it pertains to punitive damages, and reinstate the jury’s punitive damage awards. We affirm those portions of the trial court’s order granting FNBO’s motion for j.n.o.v. on the damages awards for equipment lease acceleration, injury to credit reputation, and emotional distress. The case is remanded to the trial court for further proceedings consistent with this opinion.
Affirmed in part, reversed in part, and remanded. Mandate to issue forthwith.

. The trial was presided over by the Honorable James D. Hodges, Jr., Magistrate, pursuant to 28 U.S.C. § 636.

. The financing arrangement with CCC permitted the Knickerbockers to sell the sealed 1982 com when the market reached a certain price, known as the release price. This program allowed the Knickerbockers to choose between repaying the CCC loan with the actual corn that was sealed, or to sell the com in the open market at or above the release price, repaying CCC with the proceeds and retaining any excess as profit.

. Both the extent and the cause of this shortage are the subject of dispute. Robert Knickerbocker testified that the shortage was the result of a combination of mismeasurement by CCC and of shrinkage caused by spoilage. Tr. at 153-54, 159. The Knickerbockers also contend that the spoilage was the result of damage to the grain caused by a faulty grain handling system, Tr. at 30, and that any liability to CCC for shortage or deterioration would be offset by their claim against the manufacturer and installer of the grain handler. Reply Brief of Appellant at 22-23, Tr. at 135.

. FNBO has not contested the award of damages for acceleration of the equipment leases on the ground that such damages were not the reasonably foreseeable result of its conduct, and we therefore do not address the issue.

. On their intentional interference claim, the Knickerbockers sought damages for lost profits, lease acceleration, emotional distress, injury to credit reputation, and punitive damages. On the contract claim, the Knickerbockers sought damages only for lost profits and lease acceleration. Because it found that the evidence submitted in support of each of the damages claims was insufficient, the trial court granted FNBO’s motion for j.n.o.v. on both of the substantive liability claims. On appeal, however, FNBO does not challenge the jury’s finding (and we believe there was evidence from which the jury could conclude) that FNBO had a contract with the Knickerbockers to pay the landlords, and that FNBO breached that contract. Accordingly, if either of the contract damages awards were supported by sufficient evidence, then the trial court erred in granting FNBO’s motion for j.n.o.v. on the contract claim.

. The decision to grant remittitur in a diversity action is a procedural matter governed by federal, rather than state, law. See Hale v. Firestone Tire & Rubber Co., 820 F.2d 928, 936 n. 1 (8th Cir.1987). In cases where a jury awards actual damages in excess of the amount proved, remittitur to the maximum amount proved is an appropriate remedy. See Ogilvie v. Fotomat Corp., 641 F.2d 581, 586 (8th Cir.1981); see also K-B Trucking Co. v. Riss International Corp., 763 F.2d 1148, 1162-63 (10th Cir.1985) (lost profits).