# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3326

_____

Wayne Schooley; Laurie Schooley,      *
                                      *
    Plaintiffs - Appellants,         *
                                      *
v.                                    *
                                      *
Orkin Extermination, Co., Inc., a     *
wholly-owned subsidiary of Rollins,   *
Inc.; Rollins, Inc., a foreign        *
corporation,                          *
                                      *
    Defendants - Appellees.          *

Appeals from the United States
District Court for the Southern
District of Iowa.

_____

No. 06-3486

_____

Wayne Schooley; Laurie Schooley,      *
                                      *
    Plaintiffs - Appellees,          *
                                      *
v.                                    *
                                      *
Orkin Extermination, Co., Inc., a     *
wholly-owned subsidiary of Rollins,   *

Inc.; Rollins, Inc., a foreign        *
corporation,        *
       *
       Defendants - Appellants.    *

_____

Submitted: May 14, 2007
Filed: September 19, 2007

_____

Before BYE and SMITH, Circuit Judges, and NANGLE,[1] District Judge.

_____

BYE, Circuit Judge.

Wayne and Laurie Schooley (Schooleys) hired Orkin Exterminating Co., Inc., (Orkin) to protect their home against termites. After the home sustained extensive termite damage, the Schooleys sued Orkin claiming fraudulent and negligent misrepresentation. The Schooleys sought compensatory damages for repair costs, loss of use, and reduction in value, and punitive damages. A jury found in favor of the Schooleys on the fraud and negligent misrepresentation claims, and awarded $138,000 in compensatory damages and $276,000 in punitive damages. The district court granted Orkin's post-trial motion for judgment as a matter of law (JAML) on the claim for punitive damages and granted Orkin's new trial motion on the award of compensatory damages. The court denied Orkin's JAML motion on the fraudulent misrepresentation claim.[2] A second jury returned a compensatory damages award of $96,030.

_____

[1]The Honorable John F. Nangle, United States District Judge for the Eastern District of Missouri, sitting by designation.

[2]The negligent misrepresentation verdict has not been appealed.

-2-

On appeal, the Schooleys argue the district court erred by granting JAML on the claim for punitive damages and by granting a new trial on compensatory damages. In its cross-appeal, Orkin argues the district court erred by denying its JAML motion on the fraudulent misrepresentation claim. It also appeals the second award of compensatory damages, arguing the district court's instruction on compensatory damages was erroneous and it asks us to reduce the compensatory damages to $25,030. We reverse the district court's order granting JAML on punitive damages and the order granting a new trial on compensatory damages, and reinstate the original damage awards.

I

The facts viewed in the light most favorable to the fraudulent misrepresentation claim and punitive damages award are as follows. In Re Knickerbocker, 827 F.2d 281, 284 (8th Cir. 1987).

The Schooleys purchased their home in 1978 and observed no signs of termite activity until 1992. After discovering evidence of termites in 1992, they contacted Orkin. An Orkin representative inspected the home and told the Schooleys the company's treatment process would create a complete chemical barrier against termites and protect the home. The Schooleys purchased Orkin's treatment package, including an annual renewable option for a limited lifetime retreatment guarantee which stated: "Orkin guarantees that it will, at no extra cost, apply any necessary additional treatment to the premises if an infestation of the aforesaid wood infesting organism is found in the treated premises during the period this Guarantee is in force."

The house was first treated in 1992 to establish the complete chemical barrier against termites. In 1993, Orkin conducted an annual inspection and found no termite activity. Satisfied the problem was under control, the Schooleys began a remodeling

project which initially consisted of a multilevel deck attached to the back of the home. In 1994, Laurie discovered evidence of termite activity and contacted Orkin. Orkin sprayed the infested area and assured the Schooleys the problem was under control. At trial, however, Kent Heinzman, a branch manager for Orkin, testified the appearance of termite activity within two years of an initial application indicated the application had been inadequately applied or the chemical barrier had broken down. He testified the complete chemical barrier from the initial application would generally be expected to last between six to fourteen years. The Schooleys testified Orkin never provided this information to them.

In 1995, the Schooleys expected Orkin to conduct an annual inspection in March or April – it did not. In October, Laurie again discovered evidence of termite activity in the same location of the house and called Orkin. An inspector inspected the home and recommended a complete retreatment to his superiors instead of a spot retreatment. The recommended complete retreatment was not approved by the branch manager and a second spot retreatment was performed.

At trial, an Orkin technician testified spot retreatments generally do not provide complete termite control. Indeed, they can force termites from the treated area to untreated points of entry. Conversely, an unbreached chemical barrier completely prevents termites from entering the home. The Schooleys testified they were not told the inspector had recommended complete retreatment or that spot treatments could be ineffective in treating termite infestations.

Prior to 1996, the Schooleys had observed evidence of termite activity only on the walls of the basement. In July 1996, Laurie noticed for the first time the termite activity had moved from the basement to the inside wall of the front porch, the east interior wall of the dining room, the main floor, and an internal stairway in the center

of the home. Orkin told the Schooleys this was probably old damage, performed another spot retreatment, and in October pronounced the home termite free.

In 1997, the Schooleys embarked on an extensive remodeling project. Before doing so, Laurie called Orkin for assurances the termite problem was under control. Laurie described their remodeling plans and, after inspecting and applying additional chemical prophylactically, Orkin advised the Schooleys there was no termite activity. The Schooleys spent approximately $120,000 on the remodeling project which included, among other improvements, finishing the previously unfinished basement.

Upon completion of the project in 1997, Laurie again noticed termite damage around the front porch. Orkin sprayed the area and told Laurie it was old damage. In 1998, she observed pin holes in newly hung wallpaper and indentations in newly decorated walls. Nonetheless, in September 1998 and February 1999, Orkin conducted annual inspections and reported no termite activity.

Soon after the February 1999 inspection, Laurie noticed termite damage to the basement floor which had been installed as part of the 1997 remodeling project. Faced with proof of an obvious reinfestation, Orkin's inspector reported termite activity. She complained as to the spot retreatments obviously not working and expressed concern because they had extensively remodeled the home. The possibility of a complete retreatment, as suggested by Orkin's inspector in 1995, was never discussed with the Schooleys. Instead, the company installed a bait monitoring system and advised the Schooleys it would resolve the problem in no time. The Schooleys testified they relied on the company's representations of expertise in the field of termite control, believed the inspectors who said the various treatments would control the termite problem, and accepted its invitation to "trust" it to solve the termite problem.

Despite Orkin's promise to monitor the bait stations monthly, there were several months when no one came to the home. In October 1999, after waiting four months for an inspector, Laurie discovered evidence of termites in the basement stairway. She called Orkin and two days later the branch manager, Heinzman, came to the home and left a written message stating one bait trap containing 80,000 dead termites had been consumed and there was no further evidence of termite activity. At trial, Heinzman admitted there are upwards of one million termites in any given colony, capable of infesting several homes at the same time. In other words, the presence of 80,000 dead termites was no indication the infestation was under control.

In 2000, Orkin only inspected the home and bait stations when Laurie called requesting an inspection. During 2000, she observed no further evidence of termites and concluded the bait stations were working. In January 2001, however, she noticed termite damage to the main floor in the center of the home and to the floor in the main-floor bathroom. She also discovered damage to the stairway wall leading from the main floor to the second floor. Further examination revealed the wood flooring in the bathroom had been eaten by termites. Once again, Orkin assured her this was old damage but agreed to install a bait station in the bathroom. Days later, Wayne discovered evidence of active termites in the basement directly under the main-floor bathroom. Orkin was contacted and representatives assured the Schooleys the bait stations would solve the problem.

In March 2001, after being called by the Schooleys, and in April 2001, Orkin inspected the Schooleys' home and reported no activity. Two days after the April inspection, Laurie discovered obvious evidence of termites in three different locations in the basement. She called the inspector and asked why only two days earlier he had reported no activity. She was told: "I'm sorry, Ma'am. That's what they told me to put. You're what's known as a problem house."

In June 2001, the Schooleys discovered additional and extensive termite damage to the main floor of the home. They undertook repairs of the damage and in the process observed active termites in the walls of the home. A videotape documenting the damage, repairs, and live termites was presented to the jury.

At this juncture, Orkin chose to apply a different chemical to reestablish a complete chemical barrier. A month later it removed all the bait stations. Laurie asked how they would be able to monitor termite activity without the stations and was told by the branch manager he was running a business and could not afford to send someone out every month to check for termites. In the fall of 2002, the Schooleys discontinued their relationship with Orkin and hired a different termite control business.

## II

### A

Orkin argues the district court erred by denying its JAML motion on the Schooleys' claim for fraudulent misrepresentation. Orkin contends its representatives only predicted the treatments would be successful and there was no evidence Orkin suspected otherwise or intended to deceive the Schooleys. Additionally, Orkin argues there was no evidence the Schooleys relied on any alleged misrepresentations. For example, when Orkin's inspector reported no termite activity in April 2001, Laurie conducted her own inspection and discovered termites. According to Orkin, this proves the Schooleys were not relying on its representations. It also denies the Schooleys consulted with Orkin prior to undertaking the 1997 remodeling project and therefore did not undertake the project based on assurances from Orkin.

We review de novo the district court's denial of judgment as a matter of law. <u>Arabian Ag. Servs. Co. v. Chief Indus., Inc.</u>, 309 F.3d 479, 482 (8th Cir. 2002). Judgment as a matter of law is only appropriate where the evidence adduced at trial is entirely insufficient to support the verdict. <u>Id.</u> In making this determination, we consider all evidence in the record without weighing credibility, and resolve conflicts and make all reasonable inferences in favor of the non-moving party. <u>Id.</u> An inference is reasonable when it "may be drawn from the evidence without resort to speculation." <u>Id.</u> (quoting <u>Fought v. Hayes Wheels Int'l, Inc.</u>, 101 F.3d 1275, 1277 (8th Cir. 1996) (internal quotation marks omitted)).

In Iowa, fraud must be established by clear, satisfactory, and convincing evidence. <u>Beeck v. Aquaslide 'N' Dive Corp.</u>, 350 N.W.2d 149, 155 (Iowa 1984); <u>Lockard v. Carson</u>, 287 N.W.2d 871, 873-74 (Iowa 1980). The elements of fraud are 1) representation, 2) falsity, 3) materiality, 4) scienter, 5) intent to deceive, 6) justifiable reliance, and 7) resulting injury and damage. <u>Garren v. First Realty Ltd.</u>, 481 N.W.2d 335, 338 (Iowa 1992); <u>Cornell v. Wunschel</u>, 408 N.W.2d 369, 374 (Iowa 1987). Orkin argues there was no evidence it knowingly made a false representation or of justifiable reliance.

A plaintiff can establish scienter, or knowledge of the falsity of a material representation, by showing the defendant had actual knowledge of the falsity, possessed reckless disregard for the truth, or falsely stated or implied the representations were based on personal knowledge or investigation. <u>McGough v. Gabus</u>, 526 N.W.2d 328, 331 (Iowa 1995) (citing <u>Cornell</u>, 408 N.W.2d at 375-76; <u>Beeck</u>, 350 N.W.2d at 155). A plaintiff cannot recover if he "blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." <u>Id.</u> at 332 (quoting <u>Lockard</u>, 287 N.W.2d at 878). Nevertheless, the Iowa Supreme Court has refused to impose an objective standard of ordinary care on plaintiffs in fraud actions. <u>Id.</u> (citing

-8-

Lockard, 287 N.W.2d at 878). Instead, the standard is "whether the complaining party, in view of his own information and intelligence, had a right to rely on the representations." Id. (quoting Lockard, 287 N.W.2d at 878).

The evidence presented at trial shows Orkin had reason to believe as early as 1994 the initial treatment had been ineffective because the complete chemical barrier, which would normally be effective for six to fourteen years, failed to prevent reinfestation. In 1995, Orkin's inspector recommended a complete retreatment instead of further spot retreatments but the request was denied.[3] The evidence further reveals Orkin did not advise the Schooleys of these facts. Nor were the Schooleys advised spot retreatments could be ineffective. In 1996, the Schooleys discovered termite damage in parts of the home previously unaffected but were advised it was old damage. In 1997, after consulting with Orkin about a major remodeling project, Orkin pronounced the home free of termites. Within months of completing the project, and again in 1998 and 1999, after Orkin reported no termite activity, additional new evidence of an ongoing infestation was uncovered. It was not until 1999, when damage was discovered in the newly remodeled basement, that Orkin admitted to an ongoing problem. Notably, the admission came on the heels of an inspector's report finding no termite activity only two days earlier.

Even after the discovery of termite activity in 1999, Orkin continued to downplay the seriousness of the problem and exaggerate the effectiveness of its treatments. It installed a bait monitoring system and assured the Schooleys the problem would be solved quickly. Instead of monitoring the system on a monthly

---

[3]Orkin contends it was prohibited by federal law from performing a complete retreatment because the label on the chemical recommended against such treatments. A fair reading of the label indicates it did not absolutely prohibit complete retreatments. Rather, it recommended against them on an annual basis.

basis as promised, Orkin ignored the Schooley home and generally conducted inspections only if asked. When it was discovered one of the bait traps had been completely consumed by termites, the Schooleys were led to believe all the insects had been killed. Finally, in 2001, after repeated inspections, repeated treatments, and repeated discoveries of new termite damage, an Orkin inspector told Laurie he had been instructed to ignore obvious evidence of active termites. Later, the branch manager told her he was running a business and could not afford to send inspectors to perform promised inspections.

Orkin attacks the credibility of this evidence but does not argue that, if believed, it is insufficient to sustain a finding of fraudulent misrepresentation. Because we must view the evidence in the light most favorable to the verdict, Orkin's attempts to discredit the evidence must be disregarded. A fair reading of the evidence shows Orkin, over a period of ten years, intentionally minimized the termite infestation and overstated its ability to control the problem. Moreover, despite evidence early on indicating the initial treatment had not worked, Orkin refused to approve a complete retreatment in lieu of less effective, less expensive alternatives. Finally, Orkin instructed its inspector to disregard evidence of an ongoing infestation and to falsify his inspection report. Accordingly, we affirm the district court's denial of Orkin's JAML motion of the fraudulent misrepresentation claim.

B

The Schooleys argue the district court erred by granting Orkin's JAML motion on the issue of punitive damages. We agree.

Under Iowa law, a jury may award punitive damages if the plaintiff proves "by a preponderance of clear, convincing, and satisfactory evidence that the defendant's

-10-

conduct amounted to a willful and wanton disregard for the rights of another." Iowa Code § 668A.1 (1991). Punitive damages are appropriate in fraud cases when, in addition to fraud, there is some aggravating factor such as legal malice. State Savings Bank v. Allis-Chalmers Corp., 431 N.W.2d 383, 387 (Iowa Ct. App. 1988). "To establish legal malice it need only be shown that wrongful or illegal conduct was committed or continued with a reckless disregard at another's rights." Id. (quoting Kimmel v. Iowa Realty Co., Inc., 339 N.W.2d 374, 384 (Iowa 1983)). Willful and wanton means the defendant intentionally committed an unreasonable act in disregard of a known or obvious risk so as to make it highly probable harm would follow, and which is usually accompanied by a conscious indifference to the consequences. Fell v. Kewanee Farm Equip. Co., 457 N.W.2d 911, 919 (Iowa 1990) (quoting W. Page Keeton et al., Prosser & Keeton on Torts § 34, at 213 (1984)).

At the end of the Schooleys's case and again before the case was submitted to the jury, the district court denied Orkin's JAML motion on punitive damages. Once the jury awarded punitive damages, Orkin renewed its motion and the court reconsidered and reversed the award. In so holding, the court reviewed evidence offered by the Schooleys in support of their claim for punitive damages and concluded it did not constitute clear, convincing, and satisfactory evidence of willful or wanton conduct.

For example, the Schooleys offered an estimate prepared by an Orkin employee regarding the amount of chemical necessary to adequately perform the initial treatment. The estimate called for sixty gallons more of the chemical than was actually applied, and the Schooleys argued the estimate showed Orkin intentionally applied less chemical than necessary in an effort to save money. They further argued Orkin knew the failure to apply the required amount of chemical caused the complete chemical barrier to fail after only two years. The district court, instead of viewing this evidence in the light most favorable to the verdict, weighed it against conflicting

evidence tending to show the estimate overstated the amount of chemical needed, and concluded Orkin applied adequate chemical.

Similarly, the court rejected evidence suggesting Orkin knew there was a serious problem in 1995 and intentionally failed to act appropriately. The Schooleys argued Orkin knew, but failed to disclose, that the complete chemical barrier should have protected the house for at least several years. They argued when new termite activity was found in 1995, Orkin knew it should have reestablished the complete chemical barrier instead of trying less expensive remedial measures. The court concluded this evidence was not indicative of any wrongful intent because reinfestation was a possibility and the discovery of termites sooner than expected did not suggest wrongful intent. The issue, however, was not whether the parties could have anticipated the possibility of reinfestation, but rather whether, after only two years, Orkin knew the termite problem was more serious than it led the Schooleys to believe.

The Schooleys also argued there was an incentive for branch managers to authorize spot retreatments instead of more effective complete retreatments. The evidence showed each branch receives a $750 internal credit for every spot retreatment irrespective of how much each actually costs. Conversely, no internal credit is given if a complete retreatment is required. Thus, branch managers concerned about profits naturally favor spot retreatments over complete retreatments – even if the latter are less effective. The district court rejected this argument, finding there was no testimony stating the credit was expressly intended to encourage spot retreatments over complete retreatments. Further, the court concluded it was equally likely the policy was intended to protect customers by encouraging necessary spot retreatments.

The district court improperly weighed this evidence. Perhaps the policy was instituted to protect customers and not to maximize profitability at the expense of customers. That decision, however, was for the jury. If, as the district court stated, there were equally plausible explanations for the policy, it was improper for the district court to substitute its judgment for the jury's.

The district court's order granting JAML discusses and rejects additional evidence offered in support of the punitive damages claim, but fails to mention other evidence of willful or wanton conduct offered by the Schooleys. For example, the district court failed to mention 1) the rejected 1995 recommendation that a complete retreatment be performed, 2) evidence indicating Orkin knew a complete chemical barrier should last at least six to fourteen years, 3) Orkin's repeated claims that new evidence of termites was undiscovered old damage, and 4) Orkin's assurances, notwithstanding evidence of a serious ongoing infestation, that the termite problem was under control. The district court also ignored Laurie's testimony indicating she was told by an inspector he was instructed to file a false report and disregard obvious evidence of a serious ongoing infestation.[4] Finally, there is no mention of the branch manager's refusal to authorize monthly inspections as promised.

Viewing this evidence in the light most favorable to the jury's verdict, we conclude there was sufficient evidence to show Orkin intentionally misled the Schooleys and consciously disregarded the harm almost certain to occur from the unabated infestation. Accordingly, we reverse the district court's grant of JAML and reinstate the award of punitive damages.

---

[4]In its discussion of the fraud claim – but not the punitive damages claim – the district court compares Laurie's testimony with the inspector's trial testimony denying the admission. In doing so, the court improperly weighed the credibility of the evidence.

C

The Schooleys appeal the district court's order granting Orkin's motion for a new trial on compensatory damages. Orkin cross-appeals the jury's award of compensatory damages from the second trial, arguing the district court's compensatory damages instruction misstated the law.

At the first trial, the Schooleys offered evidence of Orkin's net worth ($138 million) in support of their claim for punitive damages. After holding the issue of punitive damages should not have been presented to the jury, the district court concluded the compensatory damages award ($138,000) was suspect because of its similarity to the evidence regarding Orkin's net worth. The court further concluded the damages evidence presented by the Schooleys did not support the award and granted a new trial.

The district court may order a new trial if convinced the verdict goes against the clear weight of the evidence or where a miscarriage of justice will result. Benjamin v. Aluminum Co. of Am., 921 F.2d 170, 173 (8th Cir. 1990). While the district court's discretion is not boundless, it can rely on its own reading of the evidence in determining whether the verdict goes against the clear weight of the evidence. White v. Pence, 961 F.2d 776, 780 (8th Cir. 1992). We review a grant of new trial for abuse of discretion. Mears v. Nationwide Mut. Ins. Co., 91 F.3d 1118, 1123 (8th Cir. 1996).

The amount of damages awarded is a function of the jury, not the court, Gorden v. Carey, 603 N.W.2d 588, 590 (Iowa 1999), and a court should not set aside a verdict simply because it might have reached a different conclusion, Ort v. Klinger, 496 N.W.2d 265, 269 (Iowa Ct. App. 1992). The jury's verdict should not be set aside or altered unless it 1) is flagrantly excessive or inadequate, 2) is so out of reason as to shock the conscience or sense of justice, 3) raises a presumption it is the result of

-14-

passion, prejudice, or other ulterior motive, or 4) is lacking in evidentiary support. Gorden, 603 N.W.2d at 590.

> The most important of the above enumerated tests is support in the evidence. If the verdict has support in the evidence the others will hardly arise, if it lacks support they may all arise. The real question in most cases, and here, is the amount and sufficiency of evidence to support the award made. *Where the verdict is within a reasonable range as indicated by the evidence we will not interfere with what is primarily a jury question.*

Yoch v. Cedar Rapids, 353 N.W.2d 95, 98 (Iowa Ct. App. 1984) (emphasis added).

The district court is not required to grant a new trial on compensatory damages because evidence of a defendant's net worth was allowed and an award of punitive damages is later reversed. Lala v. Peoples Bank & Trust Co. of Cedar Rapids, 420 N.W.2d 804, 807 (Iowa 1988). A new trial may be required if it appears the jury improperly considered evidence of net worth in calculating an award for compensatory damages. Id.

At trial, the Schooleys presented evidence through Alan Janssen, a certified appraiser, showing their home was appraised in 1998 at $157,000. He testified the house would be worth only 20-30% of its appraised value due to a history of termite infestation. According to Janssen, the Schooleys suffered a loss in value of between $109,900 to $125,000. The Schooleys also presented evidence showing they had incurred approximately $8,000 in repair costs. Further, despite the district court's claim that the loss of use damages were unsubstantiated, the record shows Laurie testified the Schooleys were unable to use much of their home while repairs were undertaken during January, February, June, July, August and September of 2001. The district court's post-trial order accepted the evidence relating to cost of repairs, rejected any loss of use damages, and questioned the loss in value evidence because

-15-

no current appraisal showing the value of the home at the time of trial was offered. In the end, the district court's decision to grant a new trial was primarily based on the correlation between the evidence of net worth and the award of compensatory damages.

The award of compensatory damages is well within the range of potential awards supported by the evidence presented at trial. Assuming a loss in value of $125,000, coupled with $8000 in repair costs, the jury could reasonably have found damages of $133,000 before ever considering any loss of use damages. We note the district court expressed concern about the reliability of the 1998 appraisal, but it did not reject it as without evidentiary value. Indeed, the jury could have reasonably inferred a more recent appraisal would have shown the loss in value was higher. Further, it was an abuse of discretion to reject the Schooleys's loss of use damages when there was evidence offered to support the claim. We find nothing about the jury's compensatory damages award of $138,000 excessive or shocking to the conscience or to our sense of justice. We conclude the Schooleys presented adequate evidence of loss in value, loss of use, and cost of repairs to support the award of $138,000. Because the award was "within a reasonable range as indicated by the evidence," the district court abused its discretion by "interfer[ing] with what is primarily a jury question." Yoch, 353 N.W.2d at 98. Accordingly, we reverse the grant of a new trial and reinstate the original award of compensatory damages.

## III

We affirm the district court's order denying Orkin's JAML motion on the issue of fraudulent misrepresentation. We reverse the district court's order granting JAML on the punitive damages award and its order granting a new trial on compensatory damages, and reinstate the original awards of compensatory and punitive damages. Because our decision renders it moot, we do not reach Orkin's cross-appeal.

_____

-16-